FILED

08/29/2017

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
June 27, 2017 Session[1]

**STATE OF TENNESSEE v. HOLLY N. HILLIARD**

**Appeal from the Criminal Court for Sullivan County**
**No. S61553   R. Jerry Beck, Judge**

_____

**No. E2015-00967-CCA-R3-CD**

_____

**AND**

**STATE OF TENNESSEE v. BRIAN REYNOLDS**

**Appeal from the Criminal Court for Sullivan County**
**No. S61558   R. Jerry Beck, Judge**

_____

**No. E2015-00969-CCA-R3-CD**

_____

**AND**

**STATE OF TENNESSEE v. JOSEPH A. TESTER II**

**Appeal from the Criminal Court for Sullivan County**
**No. S62173   R. Jerry Beck, Judge**

_____

**No. E2015-00970-CCA-R3-CD**

_____

_____

[1] Following oral argument on June 29, 2016, one judge discovered a conflict and recused himself. By order entered January 12, 2017, this case was rescheduled for oral argument before the current panel, and the parties were requested to file supplemental briefs addressing the legality of the knock and talk investigative procedure used by the Sullivan County Sheriff's Department. Following the filing of supplemental briefs by the parties, a second round of oral argument was conducted on June 27, 2017.

This is a consolidated appeal by the State. Holly N. Hilliard ("Ms. Hilliard"), Brian K. Reynolds ("Mr. Reynolds"), and Joseph A. Tester, II ("Mr. Tester") (collectively, "the Defendants") were charged, via presentment, with conspiracy to manufacture over .5 grams of methamphetamine within 1,000 feet of a school. The presentment also charged Ms. Hilliard and Mr. Reynolds with one count of manufacturing greater than .5 grams of methamphetamine within 1,000 feet of a school, two counts of attempted aggravated child neglect, one count of maintaining a dwelling where controlled substances are used or sold, and one count of possession of drug paraphernalia. The Defendants moved to suppress evidence found in a warrantless search of their residence. Following a suppression hearing, the trial court found that the officers' subjective reasons for entering the house were inconsistent, that there were not sufficient exigent circumstances to justify a protective sweep, and that the officers' entry into the residence was an illegal warrantless search. The trial court granted the motions and suppressed the evidence found in the residence. Upon review, we conclude that the trial court erred by using a subjective rather than objective test in finding that the exigent circumstances were not sufficient to justify the officers' entering the residence to perform a protective sweep. However, we determine that the police officers' knocking on the front door for ten to fifteen minutes while announcing their badge of authority rendered the encounter with Ms. Hilliard nonconcensual and the knock and talk investigation unlawful. The subsequent warrantless entry of the residence therefore violated the prohibition against unreasonable searches and seizure under the Fourth Amendment of the United States Constitution and article 1 section 7 of the Tennessee Constitution. The subsequent consent to search given by Ms. Hilliard was not voluntary and resulted from an exploitation of the prior illegality. We, therefore, affirm the judgments of the trial court suppressing the evidence in these three cases.

**Tenn. R. App. P.3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Barry Staubus, District Attorney General; and Josh D. Parsons, Assistant District Attorney General, for the appellant, State of Tennessee.

- 2 -

Cameron L. Hyder, Elizabethton, Tennessee (on appeal), and Clifton L. Corker, Johnson City, Tennessee (at hearing), for the appellee, Holly Hilliard.

Jeremy E. Harr, Kingsport, Tennessee, for the appellee, Brian K. Reynolds.

Gene G. Scott, Jr., Jonesborough, Tennessee, for the appellee, Joseph A. Tester, II.

## OPINION

### Factual and Procedural Background in the Trial Court

This case arises from a knock and talk performed by officers with the Sullivan County Sheriff's Department on October 9, 2012. Almost two years later, Ms. Hilliard filed a motion to suppress all evidence found during the warrantless search of her residence. This motion claimed that the "protective sweep" conducted before Ms. Hilliard gave consent was an illegal search and that the search conducted after Ms. Hilliard gave consent was illegal because a search had already taken place and her consent was not voluntarily given. On January 9, 2015, Mr. Tester also filed a motion to suppress all evidence found in the search of the residence in which he resided with Ms. Hilliard. The State filed a "Response to Motion to Suppress" on March 27, 2015. Mr. Reynolds orally joined both of his co-defendants' motions to suppress.

*Suppression Hearings*

A short suppression hearing was held in the late afternoon on February 23, 2015, but the hearing was continued to April 2, 2015, where the bulk of the proof was presented. Sullivan County Sheriff's Department Detective Ray Hayes was the only witness who testified at the February hearing and was the first witness called in April. He testified that he received a cell phone call on October 9, 2012, from a confidential informant ("CI") stating that the CI had observed methamphetamine being made at the Defendants' residence that morning. The CI stated that Mr. Tester, Ms. Hilliard, and two minor children were in the home. This CI had worked with Detective Hayes for approximately one year and had provided information over twenty times. Based on his experience with this CI, Detective Hayes believed him to be reliable.

- 3 -

Detective Hayes testified that "[w]e were going to apply for a search warrant, but . . . we were afraid during that time . . . something could happen to the children." Detective Hayes decided to conduct a knock and talk at the residence and began assembling a group of officers to assist. Detective Hayes, along with Sergeant Burk Murray, two other detectives, and two patrol officers went to the residence that afternoon. One patrol car was parked in the driveway, and three other vehicles were parked on the adjacent property or on the road in front of the residence. Detective Hayes, Sergeant Murray, and one uniformed patrol officer went to the front door. The other three officers went to the side and rear of the property so that they could observe the other doors to the residence. Detective Hayes stated that they "surrounded the house with officers" for officer safety but that the officers did not have their weapons drawn. One uniformed patrol officer knocked on the front door "multiple times" and announced "Sullivan County Sheriff's Office." Detective Hayes testified that he could hear "scattering" inside the residence when they knocked. He said that even though the movement in the house caused concern about officer safety they did not draw their weapons at that time.

Detective Hayes said that they continued knocking and announcing, and after "[p]robably about ten minutes," Ms. Hilliard opened the door, holding a small child. Detective Hayes testified that, when Ms. Hilliard opened the door, "there was a chemical smell that came from the house" that he "specifically associated with the manufacture of methamphetamine." Detective Hayes stated that he had worked over 300 methamphetamine laboratory cases during his career and that he was very familiar with the smell of methamphetamine being manufactured. He asked Ms. Hilliard if there was anyone else inside the house. Ms. Hilliard initially lied but shortly thereafter recanted and told Detective Hayes that Mr. Reynolds was inside. Detective Hayes advised Ms. Hilliard that he had received reliable information that methamphetamine was being manufactured in the house and asked for consent to search. Ms. Hilliard responded, "No . . . [y]ou'll have to get a search warrant." Detective Hayes asked Ms. Hilliard to step out of the house, and after she complied, he called for Mr. Reynolds to come to the door. At that time, the officers drew their weapons. Mr. Reynolds came to the door after "probably five to ten minutes." Mr. Reynolds was handcuffed for "officer safety." Ms. Hilliard was not handcuffed.

Detective Hayes stated that officers decided to perform a "protective sweep" because "[w]e didn't know if the other [child] was in there, and we didn't know if any other subjects were in the house." He said that, based on his training and experience, methamphetamine laboratories are very dangerous. He explained that the one-pot

- 4 -

method involved the use of a "gasser" bottle that contained "hydrogen chloride gas which, in contact with water, becomes hydrochloric acid." Detective Hayes testified that hydrogen chloride fumes were toxic and that there was a danger of "bottle failure" resulting in an explosion and fire. During the protective sweep, he saw, in the upstairs master bedroom in plain view, "a crushed pill, cut straws, and a mirror with white residue on it." In the basement, Detective Hayes observed "some tubing, some pipes, a cut cold pack, . . . some Drano, some filters, and some Morton salt." He said these were common ingredients or components used in the manufacture of methamphetamine. Detective Hayes said that, during the sweep, the officers only looked in areas of the house large enough to conceal a human being. The officers did not find any other people in the house during the sweep.

Detective Hayes informed Ms. Hilliard of the items that he had seen during the protective sweep and again asked for consent to search. She again refused to consent. Officer Hayes then went to his vehicle to prepare paperwork for a search warrant. While working on the search warrant, Detective Hayes was informed by Sergeant Murray that Ms. Hilliard had changed her mind and consented to a search. Ms. Hilliard then signed a consent to search form and a *Miranda* rights waiver. After the form was signed, officers put on protective suits and searched the residence.

During cross-examination, Detective Hayes stated that he did not know the exact time the CI called but that it was in the morning. When questioned further, he estimated that the CI called around 8:30 or 9:00 a.m., and he stated that the CI had been to the residence that morning. Later in cross-examination, Detective Hayes stated that the CI did not say when he was at the residence and that he was "just making an assumption" that it was that morning.

Detective Hayes agreed that he could have attempted to obtain a search warrant but did not. He stated that it would have taken approximately two to three hours to obtain a search warrant. He also agreed that he arrived at the Defendants' residence to conduct a "knock and talk" at 2:56 p.m. and that officers were at the residence for approximately thirty minutes before conducting the protective sweep. Detective Hayes stated that the sweep was performed "for officer safety and [to] make sure that there was no active cook going on at the time," as well as to look for the second child. Detective Hayes stated that, after they conducted the sweep, Ms. Hilliard told him that the second child was at school. Detective Hayes initially said that a gasser bottle was found during the sweep, but he later stated that he could not recall which items of evidence were found during the sweep and

which items were found after Ms. Hilliard signed the consent form. After refreshing his memory with the case summary that he had prepared following the search, Detective Hayes could not explain why he did not mention in his report that he smelled a strong chemical odor when the front door was opened. Detective Hayes agreed that the case summary only mentioned a faint chemical odor that he smelled when he went downstairs during the protective sweep. In explaining any discrepancy between his testimony and the report, Detective Hayes said that the gasser bottle could have been moved downstairs after officers knocked on the front door.

Sergeant Murray testified that he and a uniformed patrolman accompanied Detective Hayes to the front porch of the residence in order to conduct the knock and talk and that Detective Hayes and the patrolman knocked. Sergeant Murray said no one immediately came to the door, but they could hear "people moving around back and forth through the house." Sergeant Murray recalled that it took about ten or fifteen minutes for Ms. Hilliard, who was carrying a small child, to open the front door. When Ms. Hilliard opened the door, Sergeant Murray detected "the odor of chemicals that [he] associated with a hydrogen chloride gasser" based upon his experience at hundreds of methamphetamine labs. Ms. Hilliard initially claimed that no one else was inside the residence, but after being told that the officers heard a lot of noise in the house, she admitted that Mr. Reynolds was inside. Sergeant Murray stated that Detective Hayes explained to Ms. Hilliard that they had received a complaint and asked for permission to search. Ms. Hilliard refused. Sergeant Murray recalled that officers called for Mr. Reynolds to come out, and he did so in "[l]ess than a minute or two." Sergeant Murray noted:

> It's at that point we knew, from the information that Detective Hayes received that there—[Mr.] Tester resided at the home, and two children. And I instructed the rest of the deputies, Detective Ford, Detective Hayes, and Detective Dotson to do a sweep through the home, ensure there was no one else in the home because all of the commotion and the time it took for them to initially answer the door.

When asked to clarify who the officers were looking for during the "protective sweep," Sergeant Murray stated that officers were looking for Mr. Tester.

On cross-examination, Sergeant Murray agreed that the officers were going to continue to knock until somebody answered the door. He also agreed that the odor of a

- 6 -

meth lab can linger and is not necessarily associated with methamphetamine being manufactured at the time the odor is detected. He stated that the odor he smelled when the door was opened was produced when chemicals were agitated in a hydrogen chloride gasser. He explained that, when a gasser is stationary for a while, the chemicals will separate and quit producing gas, and the bottle must be reagitated to start producing gas again. He agreed that he could not determine if methamphetamine was being actively manufactured at the time he smelled the hydrogen chloride gasser, only that methamphetamine was being made or had been made in the house.

Sergeant Murray remained outside with Ms. Hilliard during the sweep. After completing the sweep, officers informed Sergeant Murray that they "observed meth – manufacturing methamphetamine components in the house and in the basement, and that . . . we would have an active lab." Sergeant Murray said Detective Hayes explained to Ms. Hilliard what the officers found inside the home and again asked for consent to search, but Ms. Hilliard again refused. Detective Hayes then stepped away to prepare the paperwork needed to seek a search warrant.

While the search warrant documents were being prepared, Sergeant Murray advised Ms. Hilliard of her rights and asked about the location of the second child. Sergeant Murray also explained the process of obtaining a search warrant. Ms. Hilliard asked how long it would take, and Sergeant Murray said, "It could be anywhere from three to six hours, depending on how efficient [Detective Hayes] [wa]s at writing the warrant and finding the judge to sign the warrant." Sergeant Murray also advised Ms. Hilliard that another detective would be contacting the Department of Children's Services ("DCS") and that he knew that she had prior dealings with DCS. Sergeant Murray told Ms. Hilliard that consenting to the search may be beneficial to her when dealing with DCS. Ms. Hilliard "thought about it for a while" and then said she would consent to a search, and Sergeant Murray informed Detective Hayes that Ms. Hilliard had changed her mind. After being advised of her right to refuse to sign, Ms. Hilliard signed a form consenting to a search of the residence. Sergeant Murray stated that Ms. Hilliard was not placed in handcuffs.

Cassidy Hyatt testified that she was Mr. Reynolds' parole officer at the time he was arrested on these charges. She received a call informing her that officers had discovered a methamphetamine laboratory at an address where Mr. Reynolds was located. Ms. Hyatt went to the residence and noted that the address was not the same as the address Mr. Reynolds had listed as his place of residence. Ms. Hyatt also stated that,

as a condition of his parole, Mr. Reynolds had agreed to submit to a search of his person, property, vehicle, or residence that was not supported by reasonable suspicion or a warrant. Mr. Reynolds told Ms. Hyatt that the residence belonged to his cousin, Mr. Tester, but that he had been staying there. Mr. Reynolds also admitted that he had helped manufacture the methamphetamine.

Robert Neial Howington lived across the street from the Defendants' residence and was sitting on his front porch when police arrived. Mr. Howington observed officers surround the house with their weapons drawn. Mr. Howington recalled that officers demanded people to exit the residence and that they knocked on the door for approximately five minutes. On cross-examination, Mr. Howington said he thought the officers had their guns drawn when they first knocked on the front door, but he "could not swear upon it."

Matthew Allen Hilliard, Ms. Hilliard's estranged husband, testified that he provided transportation for his son to and from school and Ms. Hilliard's home. He stated that Mr. Tester and Mr. Reynolds were living at Ms. Hilliard's home at the time of the "incident." He filed for divorce after Ms. Hilliard was arrested.

*Oral Ruling of the Trial Court*

After considering "the ambiguity" in the testimony of Detective Hayes and Sergeant Murray, the trial court found there were not sufficient exigent circumstances to justify entering the house for a warrantless search. The trial court announced that it "considered the ruling [that there were not exigent circumstances to conduct a warrantless search of the residence] to be [dispositive] "of all search issues . . . raised at the suppression hearing[]." Nevertheless, the trial court announced that it would discuss other issues raised in the motion to suppress. The trial court found that Ms. Hilliard twice refused to consent and that the methamphetamine laboratory and laboratory components were discovered before Ms. Hilliard signed the consent form and, therefore, Ms. Hilliard's subsequent signing of the consent to search did not cure the warrantless search or entry into the house. Additionally, the trial court held that the warrantless search could not be sustained due to the fact that Mr. Reynolds was on parole because the police did not know about Mr. Reynolds' parolee status when they conducted the search.

Concerning the failure of Detective Hayes to apply for a search warrant, the trial court noted that the CI did not state when he observed methamphetamine being

- 8 -

manufactured, and therefore, it was questionable whether Detective Hayes could have obtained a search warrant.

*Written Order of the Trial Court*

In its written order granting the motion to suppress the search as to all of the Defendants, the trial court characterized the testimony of Detective Hayes and Sergeant Murray as "conflicting," stating:

> [Detective] Hayes testified [that] they next entered the residence without consent for two purposes:
>
> (A) Protective sweep looking for other individuals;
>
> (B) Entered to look for possible child in residence.
>
> [Sergeant] Murray testified [that] he entered the residence to look for a third suspect, [Mr.] Tester, who the C.I. had informed the police was at the house.
>
> The two officers that testified at the suppression hearing caused a concern of the [trial c]ourt as to why they made a warrantless search.[2]
>
> On the one hand[,] based upon the theory that the others smelled the components of methamphetamine may have justified a warrantless search to save the child from harm. *See State v. Meeks*, 262 S.W.3d 710 (Tenn. 2008). On the other hand[,] to just look for a possible suspect [Tester] under the testimony of Murray in the suppression hearing would not offer exigent circumstances to make a warrantless search.

---

[2] The trial court was referring to the fact that Detective Hayes and Sergeant Murray gave different reasons for the officers' warrantless entry.

. . . .

If there are conflicts as to why the police entered, the [trial c]ourt is left in a position of picking between the two if possible. Both officers appear to be credible and the [trial c]ourt cannot cho[o]se between them. To repeat, the [S]tate has the burden.

The warrantless search thus appears to be unreasonable considering the two versions of why the police entered.

Concerning the consent given by Ms. Hilliard, the trial court stated:

In any case, the officers conducted a search without the consent of anyone. They found no other persons in the residence but did find an active meth cook in the basement.

After finding the active meth cook, etc., the police went and asked Ms. Hilliard's consent to search but again did not ask [for] Reynolds'[] permission. Both Hilliard and Reynolds were still outside of the house at the scene. Ms. Hilliard declined consent again.

The police then decided to fill out a search warrant form stating to Ms. Hilliard it would take some hours to go to a judge. The police then talked about Ms. Hilliard possibly being confronted with children's services.

Ms. Hilliard then signed a written consent form allowing the police to search. Mr. Reynolds was not asked to consent although he was still present at the scene.

Even if Ms. Hilliard finally consented, the search was already complete and the meth lab had been discovered and the consent would avail the [S]tate nothing.

The trial court reserved for a later hearing issues related to the statements given by the three defendants.

- 10 -

*State's Decision Not to Go Forward with Prosecution*

At a subsequent hearing, the State informed the trial court that it would not be able to go forward with the prosecution, and the trial court dismissed the three cases. The State filed timely appeals, and this court granted the State's motion to consolidate the three cases on appeal.

**Analysis**

In its initial brief, the State asserted that "the trial court erred in finding a lack of exigent circumstances supporting the initial entry into the Defendant's residence based upon the subjective intent of the officers." As the State correctly argued, "[i]n assessing whether exigent circumstances justify a warrantless search, the proper inquiry is whether exigent circumstances give rise to an objectively reasonable belief that there was a compelling need to act and insufficient time to obtain a warrant." In its supplemental brief, the State argued that "no rule of law prohibits any person from approaching the front door of a residence to ask questions of the occupant."

In their initial brief, the Defendants argued that the trial court correctly found, based on the totality of the circumstances, that there were not sufficient exigent circumstances to justify entering the Defendants' residence without a warrant. In their supplemental brief, the Defendants argued that the "officers exceeded the scope of a permissible knock and talk because they knocked on the door of Ms. Hilliard's home for ten to fifteen minutes[.]"

*Standard of Review*

When reviewing a trial court's decision on a motion to suppress, this court is bound by the trial court's findings of fact unless the evidence preponderates otherwise. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Questions of credibility, the weight and value of the evidence and resolutions of conflicts in the evidence are resolved by the trial court. *Id.* The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. *Id.* We review the trial court's conclusions of law de novo. *State v. Carter*, 160 S.W.3d 526, 531 (Tenn. 2005).

- 11 -

*Warrantless Searches*

Both the United States and Tennessee Constitutions prohibit unreasonable searches and seizures. U.S. Const. amend. IV; Tenn. Const. Art. I, § 7. A warrantless search or seizure is presumed unreasonable, and the "evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971)). Commonly recognized exceptions to the warrant requirement include: (1) a search incident to a lawful arrest; (2) the plain view doctrine; (3) consent to search; (4) a stop and frisk based on reasonable suspicion of criminal activity; and (5) probable cause accompanied by the existence of exigent circumstances. *State v. Meeks*, 262 S.W.3d 710, 722, 726 (Tenn. 2008). In the case of a warrantless search, the State bears the burden of proving that the search was conducted pursuant to one of the exceptions to the warrant requirement. *Id.*

*Failure to Obtain a Search Warrant*

The Defendants maintain that the warrantless search of their residence was not reasonable because the CI had provided Detective Hayes sufficient information to allow him to obtain a search warrant in the six hours that elapsed between the time the CI telephoned Detective Hayes and the time the officers conducted the knock and talk.

Unlike a warrantless entry into a residence based on exigent circumstances, which requires law enforcement officers to determine upon the discovery of exigency if there is sufficient time to obtain a search warrant, *Meeks*, 262 S.W.3d at 723, law enforcement officers are not required to seek a search warrant, even if there might be sufficient information and ample time to do so, before they conduct a knock and talk investigation. *Florida v. Jardines*, 569 U.S. 1, 133 S.Ct. 1409, 1416 (2013) (quoting *Kentucky v. King*, 563 U.S. 452, 469 (2011)) ("[A] police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'"). "Law enforcement officers are under no constitutional duty to call a halt to criminal investigation the moment they have the minimum evidence to establish probable cause . . . ." *Hoffa v. United States*, 385 U.S. 293, 310 (1966), *see also State v. Hendrix*, 782 S.W.2d 833, 836 (Tenn. 1989) (officers had sufficient probable cause to seek a search warrant but instead legally conducted a "phone rip-off," in which they telephoned the defendant and told him that the police were on the way to his house with a search

warrant, and subsequently arrested the defendant after he left his home). "Faulting the police for failing to apply for a search warrant at the earliest possible time after obtaining probable cause imposes a duty that is nowhere to be found in the Constitution." *King*, 563 U.S. at 467.

Even though the officers in this case were not required to obtain a search warrant before conducting a knock and talk investigation, forgoing a search warrant has certain inherent risk. The occupants might not be home, or they might simply choose to not answer the door. Even if an occupant answers the door, the encounter may be found to be nonconsensual. If the ultimate goal of an officer is to enter the residence to search for evidence rather than simply talk, a knock and talk is a poor substitute for a search warrant because the burden is on the State to prove the reasonableness of a warrantless search.

*Knock and Talk*

Over fifty years ago in *Davis v. United States*, the general rule for the "knock and talk" procedure was explained as follows:

> Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's "castle" with the honest intent of asking questions of the occupant thereof—whether the questioner be a pollster, a salesman, or an officer of the law.

*Davis v. United States*, 327 F.2d 301, 303 (9th Cir. 1964), *abrogation on other grounds recognized by United States v. Perea-Rey*, 680 F.3d 1179, 1187 (9th Cir. 2012). The view expressed in *Davis* is now "a firmly-rooted notion in Fourth Amendment jurisprudence." *United States v. Cormier*, 220 F.3d 1103, 1109 (9th Cir. 2000) (citing *United States v. Jerez*, 108 F.3d 684, 691 (7th Cir. 1997); *United States v. Taylor*, 90 F.3d 903, 909 (4th Cir. 1996); *United States v. Tobin*, 923 F.2d 1506, 1511 (11th Cir. 1991); *United States v. Roberts*, 747 F.2d 537, 543 (9th Cir. 1984)).

The knock and talk procedure has been recognized as a valid investigative tool by Tennessee courts. *State v. Cothran*, 115 S.W.3d 513, 521-22 (Tenn. Crim. App. 2003). The validity of the knock and talk procedure depends upon the encounter being

- 13 -

consensual in nature. *Id.* at 521. The consensual nature of such an encounter is usually determined by "the show of force exhibited by the police." *United States v. Thomas*, 430 F.3d 274, 277 (6th Cir. 2005).

Recently, the Tennessee Supreme Court held in a case of first impression that "'No Trespassing' signs posted near [the defendant's] unobstructed driveway were not sufficient to revoke the implied license referred to in *Jardines*[]" based on "the totality of the circumstances[.]" *State v. Christensen*, 517 S.W.3d 60, 77 (Tenn. 2017) (citing *Florida v. Jardines*, 569 U.S. 1, 133 S.Ct. 1409 (2013)). In discussing the nature of the "implied license" to approach an individual's residence, the United States Supreme Court in *Jardines* stated that:

> "the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds." *Breard v. Alexandria*, 341 U.S. 622, 626, 71 S.Ct. 920, 95 L.Ed. 1233 (1951). This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave . . . . Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is "no more than any private citizen might do." *Kentucky v. King*, 563 U.S. 452, 469, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011).

*Jardines*, 133 S.Ct. at 1415-16. "A sidewalk, pathway or similar passageway leading from a public sidewalk or roadway to the front door of a dwelling represents an implied invitation to the general public to use the walkway for the purpose of pursuing legitimate social or business interest with those who reside within the residence." *State v. Harris*, 919 S.W.2d 619, 623 (Tenn. Crim. App. 1995).

The above language from *Jardines*, which was quoted by our supreme court in *Christensen*, 517 S.W.3d at 70, reinforces the requirement that an encounter resulting from a knock and talk must be consensual in nature. In *Thomas*, the United States Court of Appeals for the Sixth Circuit stated:

> [W]e have held that a consensual encounter at the doorstep may evolve into a "constructive entry" when the police, while not entering the house, deploy overbearing tactics that essentially force the individual out of

- 14 -

the home. In *United States v. Morgan*, 743 F.2d 1158 (6th Cir. 1984), we held that a "constructive entry" occurred when a suspect emerged from a house "in response to coercive police conduct." And in *United States v. Saari*, 272 F.3d 804 (6th Cir. 2001), we described coercive police conduct as "such a show of authority that [the] Defendant reasonably believed he had no choice but to comply."

The difference between the two—between a permissible consensual encounter and an impermissible constructive entry—turns on the show of force exhibited by the police.

*Thomas*, 430 F.3d at 277 (some internal citations omitted). It is the defendant's burden to establish, by a preponderance of the evidence, that a knock and talk conducted by the police was invalid. *Christensen*, 517 S.W.3d at 72 (citing *United States v. Holmes*, 143 F. Supp.3d 1252, 1261 (M.D. Fla. 2015)).

In the case sub judice, approximately six hours after Detective Hayes received reliable information from a CI, six officers went to the Defendants' residence during daylight hours. Detective Hayes testified that he decided to conduct a knock and talk rather than seek a search warrant because he was concerned for the safety of the two children that the CI stated were in the residence when he observed methamphetamine being manufactured. Three officers went up on the front porch while three officers surrounded the residence and took up positions to watch the other doors. The officers knocked on the front door and announced "Sullivan County Sheriff's Office." The officers could hear people inside moving around after they knocked. The officers testified that they knocked and announced for ten to fifteen minutes before Ms. Hilliard finally opened the door. Detective Hayes asked for consent to search the residence, and when Ms. Hilliard refused, the detective told her to step out of the house. Officers then drew their weapons and ordered Mr. Reynolds to come to the door.

The officers did not "knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Jardines*, 133 S.Ct. at 1415. Rather, the officers deployed overbearing tactics that we conclude essentially forced Ms. Hilliard to open the door and exit the residence. No reasonable person would have believed that they were free to ignore the officers' prolonged and persistent knocking while announcing their badge of authority. The knock and talk procedure employed by the officers in this case

- 15 -

destroyed the consensual nature of the encounter and was unlawful based on the totality of the circumstances.

*Exigent Circumstances*

The trial court found that Detective Hayes' and Sergeant Murray's subjective reasons for entering the house were inconsistent and concluded that the search was illegal. However, exigent circumstances are viewed from an objective standpoint, and "the governmental actor's subjective intent is irrelevant." *Meeks*, 262 S.W.3d at 724. We will examine the exigent circumstance from an objective standpoint and determine the ramifications of the discovery of an exigent circumstance after a nonconsensual encounter.

"Exigent circumstances arise where 'the needs of law enforcement [are] so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.'" *Meeks*, 262 S.W.3d at 723 (quoting *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006)). "The question of whether circumstances were sufficiently exigent to justify a warrantless search is a mixed question of law and fact[,]" and the trial court's conclusions are reviewed de novo with no presumption of correctness. *Id.* at 722. Exigent circumstances sufficient to allow the warrantless search of a domicile include: (1) "hot pursuit"; (2) "to thwart escape"; (3) to prevent the immediate destruction of evidence; (4) "in response to an immediate risk of serious harm to the police officers or others"; and (5) "to render emergency aid to an injured person or to protect a person from imminent injury." *Id.* at 723. "The exigency of the circumstances is evaluated based upon the totality of the circumstances known to the governmental actor at the time of the entry." *Id.* The State may not rely on mere speculation but "must rely upon specific and articulable facts and the reasonable inferences drawn from them." *Id.* at 723-24.

In *Meeks*, our supreme court held that "[t]he undisputed facts clearly establish the sort of exigent circumstances that justified the officers' decision to enter [the motel room] without first obtaining a search warrant." *Id* at 726-27. The officers responded to a call of an odor coming from a motel room, and when they arrived, they recognized the "unmistakable" odor of a methamphetamine laboratory. *Id.* at 714. The officers heard voices in the suspects' room and knocked on the door, but no one answered. *Id.* After approximately five to ten minutes, the officers decided to enter the room "because of the dangers posed by manufacturing methamphetamine" to the occupants of the room and

- 16 -

other guests at the motel. *Id.* at 715. When they forced open the door, they found two men and an active methamphetamine laboratory. *Id.*

In this case, Detective Hayes and Sergeant Murray testified that they entered the residence "in response to an immediate risk of serious harm to the police officers or others," which is a recognized exigent circumstance sufficient to allow the warrantless search of a domicile. *Id.* at 723 (citing *Stuart*, 547 U.S. at 403; *Minnesota v. Olson*, 495 U.S. 91, 100 (1990); *United States v. Huffman*, 461 F.3d 777, 782 (6th Cir. 2006); *State v. Adams*, 238 S.W.3d 313, 321 (Tenn. Crim. App. 2005)). However, unlike *Meeks*, there is no proof in the record that the officers smelled an odor they associated with the manufacture of methamphetamine *before* Ms. Hilliard opened the door. Before the door was opened, the officers only knew that the CI claimed that he saw Ms. Hilliard and her two children and Mr. Tester in the home at some previous time while methamphetamine was being manufactured. The officers did not know when the CI was in the home or whether it was even the same day he telephoned Detective Hayes. There is no proof in the record that the officers were concerned about "the immediate destruction of evidence" when they heard movement inside the residence. *Id.* at 723. The officers did not have probable cause to believe that a criminal offense was being committed or was going to be committed or that there were exigent circumstances justifying a warrantless entry into the residence before Ms. Hilliard opened the door. As we have previously determined, the prolonged knocking while announcing their badge of authority destroyed the consensual nature of the encounter, resulting in the unlawful knock and talk. Because the exigent circumstance was discovered as a result of the nonconsensual encounter with Ms. Hilliard and because the officers lacked probable cause to search prior to the nonconsensual encounter, the warrantless search violated the Defendants' rights under both the U.S. and Tennessee constitutions. *See State v. Linda Greene*, No. E2008-00884-CCA-R3-CD, 2009 WL 3011108, at *8 (Tenn. Crim. App. Sept. 22, 2009) (holding "that the State's proof was not sufficient to establish probable cause for the officers to have left their course from the knock and talk and go to the place where they observed the methamphetamine lab in plain view[]" and "that absent probable cause, there were no exigent circumstances to permit the warrantless entry into the curtilage, and the officers' entry into the curtilage violated the defendant's constitutional rights under the Fourth Amendment and article I, section 7[]"), *no perm. app. filed*. The trial court properly suppressed the evidence arising from the officers' protective sweep.

"Whether an individual voluntarily consents to a search is a question of fact to be determined from the totality of the circumstances." *State v. Berrios*, 235 S.W.3d 99, 109 (Tenn. 2007) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973), *State v. Cox*, 171 S.W.3d 174, 184 (Tenn. 2005)). Our supreme court stated in *State v. Ingram* that "a consent to search that is preceded by an illegal seizure is not 'fruit of the poisonous tree' if the consent is both: 1) voluntary, and 2) not an exploitation of the prior illegality." 331 S.W.3d 746, 760 (Tenn. 2011) (quoting *Berrios*, 235 S.W.3d at 109) (internal quotation marks omitted). "Under the 'fruit of the poisonous tree' analysis, the focus is on whether the evidence was obtained by exploitation of the Fourth Amendment illegality." *Id.* (quoting *State v. Huddleston*, 924 S.W.2d 666, 674 (Tenn. 1996)) (internal quotation marks omitted). In *Ingram*, the defendant consented to a search of his residence after officers searched his person. *Id.* at 752-53. Our supreme court stated that "[t]he validity of the search of the [d]efendant's residence depends on whether the [d]efendant consented to the search and if so, whether that consent was the product of the previous invalid search of his person." *Id.* at 759-60.

In *State v. Garcia*, our supreme court adopted the following factors from *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975), to evaluate whether the causal connection between an unlawful seizure and a subsequent consent has been broken: "1) the temporal proximity of the illegal seizure and consent; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the official misconduct." 123 S.W.3d 335 (Tenn. 2003). We will apply the same test to determine whether Ms. Hilliard's consent was sufficiently attenuated from the officers' earlier warrantless entry and search of her residence. *See Ingram*, 331 S.W.3d at 760-61 (applying the *Brown* factors to unlawful police search and subsequent consensual search).

In this case, we conclude that Ms. Hilliard's consent was not voluntary and resulted from an exploitation of the prior illegal knock and talk. Ms. Hilliard had been previously exposed to a coercive and nonconsensual knock and talk when the officers knocked on her door and announced their presence for ten to fifteen minutes. Before the officers conducted the protective sweep, Ms. Hilliard denied the officers' request for permission to search her residence. Based on claimed exigent circumstances, the officers entered the residence and conducted a protective sweep, during which they observed paraphernalia and ingredients used in the manufacture of methamphetamine. After the protective sweep, Ms. Hilliard asked how long it would take the officers to obtain a

search warrant. Sergeant Murray told her that it "could be anywhere from three to six hours[.]" Sergeant Murray knew that Ms. Hilliard had prior dealings with DCS and he told Ms. Hilliard that consenting to the search may be beneficial to her when dealing with DCS. It was only then that Ms. Hilliard consented to a search of her home.

Although it is unclear from the record how much time passed between the initial protective sweep and the second search, it is clear that Ms. Hilliard consented to the search shortly after the officers constructively entered her home. This factor weighs in favor of suppression. Additionally, there were no intervening circumstances between the officers' initial warrantless entry and their consensual search; this factor also weighs in favor of suppression. Further, the officers' misconduct of knocking on Ms. Hilliard's door for ten to fifteen minutes while announcing their badge of authority was a flagrant violation of the Defendants' rights. Lastly, Sergeant Murray agreed on cross-examination that the officers were going to continue to knock until somebody answered the door, showing that the purpose of the officers' illegal action was to gain warrantless entry into Ms. Hilliard's home. This factor also weighs in favor of suppression. Based on the totality of the circumstances, Ms. Hilliard's consent was not voluntary and resulted from an exploitation of the prior illegal knock and talk. As such, any evidence seized during the search of the Defendants' residence after Ms. Hilliard signed the consent form is "fruit of the poisonous tree," and we agree with the trial court's decision to suppress this evidence.

## Conclusion

After a thorough review of the record and applicable case law, we affirm the judgments of the trial court granting the motions to suppress.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 19 -